150 N.J. Super. 204 (1977)
375 A.2d 295
STATE OF NEW JERSEY, PLAINTIFF,
v.
LAWN KING, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND JOSEPH SANDLER, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 27, 1977.
*210 Mrs. Martha K. Kwitny and Mr. Robert J. Clark, Deputy Attorneys General, for the State (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
Mr. John A. Craner for defendants (Messrs. Craner and Nelson, attorneys).
IMBRIANI, J.C.C.
On May 21, 1970 the New Jersey Antitrust Act became effective. N.J.S.A. 56:9-1 et seq. Its stated purpose is "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade."
The statute contemplates both criminal and civil actions to attain its purposes. This is the first criminal case thereunder. Defendants waived a trial by jury. The trial consumed five weeks.
The problem of restraints of trade is not of recent vintage; it has roots in our common law. But it was in 1890, when the federal Antitrust Act, known as the Sherman Act, 15 U.S.C.A. § 1 et seq. was adopted, that restraints were assaulted in earnest. Prior to 1890 at least 13 states legislated their own statutes. Thorelli, The Federal Antitrust Policy: *211 Origin of an American Tradition, 155, n. 195. The list has expanded considerably and at the present time fewer than eight states are without comparable statutes. 26 Fla. L. Rev. 653, 658 (1974).
The significant language of the federal and New Jersey statutes are essentially alike:

Federal: New Jersey:
Every contract, combination in the Every contract, combination in the
form of trust or otherwise, or form of trust or otherwise, or
conspiracy, in restraint of trade or conspiracy in restraint of trade or
commerce among the several States, or commerce, in this State, shall be
or with foreign nations, is declared unlawful. N.J.S.A. 56:9-3.
to be illegal. 15 U.S.C.A. § 1

To provide uniformity with the Sherman Act and to supply our courts with a reservoir of experience, the Legislature wisely provided that our statute "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes * * *" N.J.S.A. 56:9-18. Thus, while one would initially presume this case novel and innovating, the converse is true. For an analysis of pre-1970 New Jersey precedent, see Grillo v. Bd. of Realtors of Plainfield Area, 91 N.J. Super. 202 (Ch. Div. 1966).
Our history books are full of tales of the robber barons of yesteryear, who devised many illicit schemes to make money. One of the more nefarious schemes was the combination or trust whose purpose was to compel the retail merchant to do business in a certain fashion. He was directed what to sell, where to sell, what price to charge, where to buy his products, and a myriad of other dictates. The evil was two-fold: first, the retailer was precluded from following his occupation according to his skill, industry and ingenuity, and, second, the public suffered because, by the loss of competition amongst retailers, it did not receive the benefits of price reductions, quality enhancements, quantity discounts, and the like.
*212 To curb such restraints Congress enacted the Sherman Antitrust Act, which has remained with little change to this date. The act did not create any substantive rights but rather specified methods by which business may not be conducted. The Sherman Act has been described as the Magna Carta of free enterprise and was
* * * designated to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. [Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958)]
What the Sherman Act sought was to sweep away all obstacles to open and unfettered trade, to create a system where businessmen may trade freely to negotiate whatever contracts with both suppliers and the public as they deemed best, and to preserve, and perhaps promote, the normal competitive forces that subsist within a free and independent society. To the end that this can be accomplished, the businessman will prosper and the public will benefit.
It is axiomatic that the law does not seek to hinder or punish the successful businessman, but rather to guarantee that such success is built upon an economic order patterned upon our cherished philosophy of freedom of enterprise.
Each case must be viewed in light of its own set of facts. Rarely are any two cases precisely alike. What do we have here?

Facts
This is a three-tiered system. At the apex is Lawn King, the defendant corporation. One step below, and in the middle, is the distributor, who operates on a county-wide basis. At the lowest tier is the dealer, who generally operates in one or more municipalities and deals directly with the public.
*213 At the outset I should note that if all three tiers were part of a single corporate structure there would not be any antitrust problem. But that is not the situation here.
Joseph Sandler, the individual defendant, was and still is president of Lawn King and controlled 95% of its common stock. After a long association with a competitor, Lawn-O-Mat, he resigned to form his own company in 1970. A detailed explanation of the Lawn-O-Mat method of operation (followed in many respects by Sandler) and of the litigation which ensued may be found In Sandler v. Lawn-O-Mat, 141 N.J. Super. 437 (App. Div. 1976).
For all intents and purposes, Lawn King and Joseph Sandler are one and the same. The distributors and dealers are separate and distinct business entities, some doing business through corporations, others as partnerships, and many as individual proprietors.
Beginning in 1970 Lawn King advertised extensively for the sale of distributorships and dealerships. When the indictment was returned on June 15, 1973 a total of 158 dealerships existed  58 in New Jersey and 100 in nine other states. There were substantially fewer distributorships in at least four states.
As its name implies, Lawn King is in the business of providing lawn care. Several programs are offered, each providing for the application of seed and chemicals to lawns with special equipment. Designated amounts and types of seed and chemicals are applied to lawns through the use of a tractor-drawn combine, which punctures the lawn, deposits the chemicals and seed, and finally rolls the lawn  all in a single operation.
The distributor oversees the dealers in this county, sells seeds and chemicals to the dealers, calls county-wide meetings to coordinate advertising, and resolves day-to-day problems of dealers. In return, he receives a mark-up of 20% of all sales of seed and chemicals to dealers and a commission of 2-1/2% of gross sales made by dealers within his territory. Most distributors purchased their franchise from Lawn King. *214 Since they did not sell to the general public, many operate from their homes. Distributors ascertain the chemicals and seed needs of dealers within their area and submit orders to Lawn King, which orders in bulk from manufacturers. Deliveries would usually be made directly to the distributors, but on occasion directly to a dealer. Responsibility for spoilage or loss rested exclusively with the distributor.
The dealer is at the retail level and deals directly with the public. Dealers, too, generally purchased their franchise directly from Lawn King, which usually covered an area of one or more municipalities and included at least 6,000 single-family homes, but some have as few as 2,000 homes and others in growth areas now have 12,000. In addition to the initial franchise fee, which was $7,500 in 1970 and increased in subsequent years, the dealer paid a commission to Lawn King of 10% of gross sales (divided 7-1/2% to Lawn King and 2-1/2% to distributors). Like distributors, dealers are responsible for all loss or damage to their equipment and products, with the sole exception of the combine, title to which remained with Lawn King.
Lawn King derived its income from the net profit on the sales of franchises, the 7-1/2% commission on gross sales by dealers, and the 20% commission from distributors on all sales of chemicals and seed to dealers. Some indication of its cash flow can be derived from the fact that in the first six months of 1973 there were chemical and seed purchases of over $456,000 and dealer sales in excess of $2.3 million.
Lawn King widely advertised the sale of distributor and dealer franchises through newspapers and television. A distributor purchased only an area. On the other hand, a dealer bought not only an area but the accoutrements of doing business, e.g., tractor, trailer, hand equipment, etc. The dealer acquired actual title to these items, with the single exception of the combine. The combine was loaned to the dealer without cost. The trailer was to be attached to *215 a truck and used to transport the tractor, combine and other equipment.
While each franchisee was part of a large multi-state operation, he presumably operated independently. There is no pooling of income or losses with either Lawn King or other franchises. Financially, each dealer was strictly on his own. This is a franchise operation, which is a form of doing business that has seen explosive growth in the past decade, and of which more is said hereafter.
Lawn King educated the dealers not only as to how to service lawns but also how to sell to the public. The keystone of the business was advertising; it was done locally by the dealer, county-wide under the direction of the distributor, and over a larger area, such as the metropolitan New York area, via newspapers and television under the auspices of Lawn King.
A loose-leaf bound Dealer Manual was distributed to each dealer. When a prospective customer was located he was referred to the dealer in his area. The Manual explains in minute detail how to generate leads, the proper method of making an appointment, the equipment to take to a meeting with a customer, and recites the proper way to make a sales presentation to a customer. Little is left to imagination.
There were three different sales programs  the important one being the 3¢ program. A customer was charged an annual fee of 3¢ per square foot, except there was a minimum charge of $120 a year (to cover a minimum area of 4,000 square feet). If the area was in excess of one acre or a charitable organization was involved, adjustments were made. This charge entitled the customer to four applications throughout the year.
Many of the chemicals were purchased from Lebanon Chemical Co., which had plants in both New Jersey and Pennsylvania.
The indictment is in seven counts, six charging illegal restraints of trade and the seventh count conspiracy with Lebanon to boycott franchisees.

*216 Preemption and Interstate Commerce
At the outset this court was confronted with defendants' dual argument that the Sherman Act has preempted the field, or, if not, the business activities of defendant substantially affect interstate commerce, thereby precluding state regulation or interference, pursuant to the Commerce Clause of the United States Constitution.
This court rejected those arguments prior to trial but reserved to defendants the right to raise the latter argument at the conclusion of the trial, because it was only then that we would know the precise extent of defendants' interstate activities.
To review briefly  although the Sherman Act was enacted 87 years ago, no state antitrust statute has ever been declared unconstitutional for being in conflict with it, Cf. Kosuga v. Kelly, 257 F.2d 48 (7 Cir.1958). This in spite of the fact that with the broad expansion of business and commerce in America since 1890, the federal courts have expansively redefined the interstate Commerce Clause to include activities formerly considered solely intrastate in nature. Further, the Supremacy Clause of the United States Constitution has been employed to strike down conflicting state action. For instance, see Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1074, 29 L.Ed.2d 233 (1971), where an Arizona Motor Vehicle Safety Act barring issuance of a driver's license for failure to satisfy an automobile accident judgment was invalidated as being in conflict with the United States Bankruptcy Act; and Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961), reh. den. 368 U.S. 1005, 82 S.Ct. 596, 7 L.Ed.2d 547 (1961), where the Georgia Tobacco Inspection Act was struck down because the Federal Tobacco Inspection Act had preempted the field.
The cases appear to hold that to ascertain if the field has been preempted, we must follow a three-step process. First, inquire into the purpose of the two statutes; *217 second, determine if they are similar with one another, and third, determine whether Congress intended to make its jurisdiction exclusive. The first test is answered by the enabling clauses. The answer to the second is affirmative on these facts. But it is the third prong of this question which points to the answer here.
The intent of Congress in passing the federal statute was lucidly explained by Senator Sherman, a sponsor of the act:
This bill as I would have it has for its single object to invoke the aid of the courts of the United States to deal with the combinations described in the first section when they affect injuriously our foreign and interstate commerce and in this way to supplement the enforcement of the established rules of the common and statute law by the courts of the several states. It is to arm the Federal courts within the limits of their constitutional power that they may cooperate with the state courts in checking, curbing and controlling the most dangerous combinations that now threaten the business property and trade of the people of the United States." [21 Cong. Record 2457 (1890); emphasis supplied]
This language patently does not bespeak preemption, but the very opposite. The perils that would confront each state if the preemption argument prevails was stated in Commonwealth v. McHugh, 326 Mass. 249, 93 N.E.2d 751 (Sup. Jud. Ct. 1950):
If State [antitrust] laws have no force as soon as interstate commerce begins to be affected, a very large area will be fenced off in which the States will be practically helpless to protect their citizens without, so far as we can perceive, any corresponding contribution to the national welfare ... Especially is this true in view of the immense broadening in the conception of interstate commerce in recent years. [326 Mass. at 265; 93 N.E.2d at 762]
There are many areas of activity where an overall national policy compels preemption and Congress or the United States Supreme Court have so ordained. But where neither has in 87 years commanded such a national policy in antitrust matters, it would be absurd for this court to do so.
*218 Defendants complain that this would compel them to be subjected to a hodgepodge of conflicting laws among the several states, as well as between federal and state laws within a single state. Perhaps so, but this is not unique. When General Motors manufactures a car it must comply not only with federal law but the laws of each state within which it sells cars; so, too, the manufacture of children's garments regarding flame-retardant specifications. And many others.
In Zook v. California, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1949), a California statute and the Federal Motor Carrier Act contained virtually identical language concerning the sale of transportation services on the roads of California. Defendants complained of multiple prosecutions. This concern was met squarely and the state statute sustained:
[T]he same act might, as to its character and tendencies, and the consequences it involved, constitute an offense against both the State and Federal Governments, and might draw to its commission the penalties denounced by either. [336 U.S. at 731, 69 S.Ct. at 844, 93 L.Ed. at 1010]
I reassert, Congress did not preempt the antitrust field with the Sherman Act.
Defendants urges in the alternative that the New Jersey statute cannot apply if their business activities in any way affect interstate commerce. Preliminarily, it would certainly be anomalous if the sphere of state regulation was to decrease (and substantially so) as the number of state regulatory agencies increased. If this court accepted defendants' argument  that state jurisdiction must cease when any guise of interstate activity appears  every state statute would be struck down since it is now recognized that every enterprise, however localized, has some effect, however remote, on interstate commerce. Rasmussen v. American Dairy Ass'n, 472 F.2d 517 (9 Cir.1973). That is why the federal courts have held that the Sherman Act applies *219 only where the business activities "substantially affect interstate commerce." Doctors Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48, 50 (3 Cir.1973). To put it another way, restraints which only affect interstate commerce in some insignificant sense are not within the federal Commerce Clause.
This court must examine and weigh the facts of this case to ascertain whether defendants' activities have a "substantial effect" on interstate commerce.
1. Lawn King was incorporated and maintained its offices in New Jersey.
2. All distributor and dealer franchise agreements were signed in New Jersey.
3. The equipment sold by Lawn King to its dealers was always picked up in New Jersey.
4. The seeds sold to distributors and/or dealers were purchased from manufacturers with plants in New Jersey.
5. The chemicals sold to distributors and/or dealers were purchased from manufacturers with plants in both New Jersey and Pennsylvania.
6. As of June 15, 1973 (date of the indictment) there were 58 dealers in New Jersey and 100 without.
7. Dealer net sales to the public in 1971 were $427,243 in New Jersey and $327,873 without, but reversed in the first six months of 1973 and were $845,571 in New Jersey and $1,531,040 without.
There are no precise guidelines to follow. We are dealing with matters of degree and emphasis, and precedent cannot divine the outcome. We are directed to apply "a practical, case-by-case economic judgment," Rasmussen v. American Dairy Ass'n, supra at 527, to fashion a ruling for each set of facts. U.S. v. Yellow Cab Co., 332 U.S. 218, 231, 67 S.Ct. 1560, 91 L.Ed. 2010, 2019 (1947).
We are dealing with the lawn care business. Its roots are local. Each distributor and dealer is independent and does business within an area that is solely intrastate. Defendants' association with each distributor and dealer at inception *220 was conducted entirely within New Jersey. Lawn King has no office outside New Jersey. Defendants' contact with interstate commerce is limited to accepting money from sales made by some dealers outside New Jersey, acting as bookkeeping conduit for purchases of chemicals and seed having some interstate aspects, and to arrange for cooperative area-wide advertising on television or in major newspapers. In spite of an increasing larger share of Lawn King's income being derived from sources without New Jersey in 1973, the nexus of its operations was still New Jersey. All rules, regulations and power emanated from New Jersey. Admittedly, the dollar volume of Lawn King's income from without New Jersey is large, but when compared with the billions of dollars passing in interstate commerce, these figures pale into insignificance. Under these circumstances can we say that defendants' activities were such that they "substantially affected interstate commerce"? I think not.
There have been numerous phrases used to describe the amount of interstate commerce necessary to satisfy the jurisdictional requirements of the Sherman Antitrust Act. The prevailing test used today is stated in Gateway Associates Inc. v. Essex Costello, Inc., 380 F. Supp. 1089 (E.D. Ill. 1974):
There are two tests to determine whether interstate commerce is involved: (1) whether the acts complained of occurred within the flow of interstate commerce, or (2) whether the acts, although wholly intrastate, substantially affect interstate commerce. See e.g. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed. 2d 554 (1967); Radiant Burners Inc. v. Peoples Gas Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's Inc. v. Broadway-Hale Stores Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732 (9th Cir.) cert. den. 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954); Kallen v. Nexus Corp., 353 F. Supp. 33, 34-35 n. 3 (N.D. Ill. 1973); DeVoto v. Pacific Fid. Life Ins. Co., 354 F. Supp. 874, 877 (N.D. Cal. 1973). * * * [at 1093]
The defense does not represent that Lawn King's operation would qualify under the first prong of this *221 test, nor would the facts lead the court to that conclusion. It asserts that Lawn King's operation "substantially affects interstate commerce." Defense counsel has taken great care at trial to show that Lawn King is involved in interstate commerce. Figures representing the respective expenditures made in and revenues received from intrastate and interstate operations were provided, and they are, in part, stated hereinabove.
There is no doubt that Lawn King's operation extends to interstate commerce, but the court is not satisfied that the restraints involved have sufficient impact on interstate commerce to be within the parameters of the Commerce Clause and Sherman Act. The critical test is set forth in Gateway, supra:
When the issue is whether jurisdiction exists in an antitrust suit, the focus is on whether the defendants' conduct  unreasonably restrictive of competition or not  has a sufficient impact on interstate commerce to justify regulation under the commerce clause, Gough v. Rossmoor Corporation, 487 F.2d 373, 376 (9th Cir.1973); and the question is not whether the acts complained of affect a business engaged in interstate commerce, but rather, whether that conduct affects the interstate commerce of that business. Page v. Work, 290 F.2d 323, 330 (9th Cir.1961), cert. denied 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 [at 1092]
While a precise definition of the phrase "substantially affects interstate commerce" has not yet been enunciated, upon careful review of the entire record this Court concludes that defendants' business activities had a nexus within New Jersey and did not substantially affect interstate commerce. R.E. Spriggs v. Adolph Coors Co., 112 Cal. Rptr. 585, 37 Cal. App.3d 653 (D. Ct. App. 1974). This result is by no means anomalous. Page v. Work, 290 F.2d 323 (9 Cir.1961); Lieberthal v. North County Lanes, 332 F.2d 262 (2 Cir.1964); Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9 Cir.1969); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8 Cir.1958), cert. den. 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959).

*222 The Per Se Rule
Although the federal and state statutes enjoin conduct "in restraint of trade," the United States Supreme Court has said that the Sherman Act does not prohibit all contracts that might in some small or insignificant manner restrain trade in interstate commerce. To guide delineation by trial courts, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), adopted a "rule of reason" analysis.
Such an approach requires a detailed analysis of the reasonableness of the particular restraints and requires the courts to ramble through the wilds of economic theory to make individual and specific determinations in each case. This court quickly realized that it was becoming involved in an area which was incredibly complicated and required prolonged economic investigations into the entire history of an industry, as well as related industries, in an effort to determine whether a particular restraint was unreasonable. Often such an inquiry, when undertaken, was found to be fruitless.
To extricate itself from a maze of business and economic intricacies, the court determined that some business relationships are per se violations of the Sherman Act without regard to a consideration of their reasonableness. The basis of the per se rule is that
There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. [Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958)]
and
[I]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act. [United States v. Topco Associates, 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515, 525 (1972)]
*223 There have developed over the years many forms of restraints that have been held to be per se violations of the antitrust laws. The result is that "a trial to show their nature, extent, and degree is no longer necessary." White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963).
The indictment charges price fixing, territory allocation and illegal tying arrangements. The State urges that the per se rule applies to each of these, and offered no independent evidence to prove a restraint of trade. It argues that once this court finds a per se violation, a verdict of guilt follows automatically.
Defendants argue that the per se rule was adopted by the federal courts in predominantly civil cases and has no application in a criminal case, where a defendant is presumed to be innocent and the State must prove guilt beyond a reasonable doubt. Further, the state statute is couched in terms of one who "knowingly" violates the act. N.J.S.A. 59:9-11. Does this suggest a legislative intent to interpose a mens rea requirement so as to preclude per se convictions? Defendants also urge that where there is a "vertical" arrangement, such as exists here, the per se rule should be abandoned and a "rule of reason" applied.
A "horizontal" restraint is one among parties at the same level of activity, while a "vertical" restraint is among parties at different levels of activities. The present case is clearly a "vertical" restraint.
The solution is not simple since the vast majority of reported cases are civil in nature. One commentator posits that the per se rule should be limited under the New Jersey act and should not be applied to a vertical restraint such as exists here, "except in the area of price fixing and similar horizontal arrangements between competitors," O'Shaughnessy, "Role of Per Se Rule Under the New Jersey Antitrust Act, 96 N.J.L.J. 1325 (1973).
In answer to defendants' first objection, there have been several cases that have applied the per se rule to criminal *224 cases. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Gasoline Retailers Ass'n, 285 F.2d 688 (7 Cir.1961); Plymouth Dealers' Ass'n v. United States, 279 F.2d 128 (9 Cir.1960). As to the second objection, there have also been several cases applying the per se rules to "vertical" restraints. United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960); Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9 Cir.1971), cert. den. 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). I reject both of these arguments.
What is meant by the use of the term "knowingly"? Is it that the State must prove defendants consciously acted in violation of the antitrust law, or must the State prove that defendants consciously intended to violate the antitrust law? The law of New Jersey as explained in State v. Wetmore, 121 N.J. Super. 90, 93 (Law Div. 1972), overruled in part, 139 N.J. Super. 556 (App. Div. 1976), is as found in 22 C.J.S. Criminal Law, § 31(3):
When used in a prohibitory statute "knowingly" imports something more than carelessness or lack of inquiry. In such statutes it has been held to mean merely a knowledge of the existence of the facts constituting the crime or a knowledge of the essential facts and not to require knowledge of the unlawfulness of the act or omission.
To the same effect, see State v. Russell, 119 N.J. Super. 344 (App. Div 1972); State v. Burden, 126 N.J. Super. 424 (App. Div. 1974); Morss v. Forbes, 24 N.J. 341 (1957).
I am satisfied that the per se rule should be applied under the New Jersey Antitrust Act, whether of a civil or criminal nature. There is no compelling reason why New Jersey should depart from the federal practice and become enmeshed in a maze of intricate and esoteric economic activities necessitating a "rule of reason" analysis. A restraint of trade will be assumed if I find a per se violation.
*225 But I also rule that in order to convict these defendants the State must prove that they acted "knowingly." But the "knowingly" required under the statute is only that defendants be shown to have acted in a conscious and purposeful manner. It is immaterial whether defendants knew or believed that their conduct violated the antitrust statute. Nevertheless, as will be indicated infra, there is ample proof that these defendants did in fact "knowingly" violate the New Jersey Antitrust Act.

Price Fixing
Dealers testified, without exception, that they charged the public 3¢ a square foot, with a minimum charge of $120 based upon a 4,000 square foot minimum area. Dealers submitted weekly reports of sales to Lawn King. The evidence overwhelmingly demonstrated that, other than for mathematical errors, all such reports are based upon a 3¢ charge. When a dealer wanted to reduce his price to meet competition or on occasion to meet a customer's demand, he would arbitrarily reduce the lawn area, without informing Lawn King, thereby effecting a price reduction while still charging 3¢ a square foot.
All of the advertising was purchased upon formats or lay-outs approved by Lawn King. Without exception they provided for the 3¢ minimum charge.
Dealers were required to submit weekly reports to Lawn King of all sales, together with their check in the amount of 10% for the commission due Lawn King. The reports had printed thereon the 3¢ rate; only the area had to be inserted. In this manner Lawn King was able to monitor dealers' sales to confirm that the 10% commission was being remitted. On several occasions dealers made a mathematical error. This resulted in their receiving from Lawn King what was to become known as a "Boo-Boo Sheet." It informed the dealer of his error and asked that the additional commission be remitted.
*226 Finally, Lawn King installed a computer system in 1972 to store and print information received in the weekly reports. The computer was programmed at the 3¢ rate.
Defendants argue that such minimum price was merely their "suggestion or recommendation" so as to assure the dealers of a profit. Defendants insisted that they had a very strong interest in the dealer's success, since that would insure Lawn King's own profitability.
This court is satisfied beyond a reasonable doubt that the 3¢ a square foot charge was not a mere "suggestion or recommendation," but that the dealers were compelled to sell their services at such minimum charge upon the threat that their franchise would be harmed or terminated if they refused to comply.
This finding is corroborated by an admission of Joseph Sandler in a transcribed conversation he had with Martin Teitelbaum, wherein Sandler said:
* * * Listen to what I'm saying. I have the right to say what type of advertising is done, what kind of advertising is done, what kind of trailer you use, what kind of trucks you use, which chemicals you use, what price you charge. Okay? The only thing that they can get me on, but I'll tip you off to what it is, is price fixing.
Lawn King argues further since all or most of its competitors were charging at the rate of 3-1/2¢ a square foot that its charge of 3¢ was fair and reasonable, thereby suggesting that such a minimum price, if reasonable, was not a restraint of trade in violation of our Antitrust Act.
But it has often been said that a price-fixing combination cannot be excused or justified because the price set is reasonable or because the combination was motivated by good intentions, laudable motives, business necessity to obtain a fair share of the market, or a desire to benefit the public. United States v. General Motors, 384 U.S. 127, 142-143, 424-425, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); United States v. Container Corp., 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); United States v. Topco *227 Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).
Perhaps this argument was best met and put to rest in United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), where it was said:
The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. [at 397, 47 S.Ct. at 379, 71 L.Ed. at 705]
Since the Trenton Potteries Co. decision the United States Supreme Court has consistently held that price fixing is per se a violation of the Sherman Act. It is immaterial whether the prices agreed upon were reasonable or unreasonable, too high or too low, or fair or unfair. United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), reh. den. 316 U.S. 713, 86 L.Ed. 1778 (1942); United States v. Parke, Davis & Co., 362 U.S. 2, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).
I am satisfied beyond a reasonable doubt from all of the evidence that defendants required its dealers to offer their services to the public at a fixed or designated price, as charged in counts 1 and 2 of the indictment.

Exclusive Territory
Dealers and distributors were assigned exclusive territories. They were proscribed from entering the territory of others, and others were prohibited from entering theirs. The only exception was if the territory was vacant and Lawn King approved of entry into what was called "open or virgin territory." Absent these two requisites, the prohibition was absolute. One dealer was even scolded for servicing the lawn *228 of his daughter located in the territory of another. A bulletin circulated by Lawn King among its dealers called Turf Talk candidly stated:
Dealers are required NOT to infringe on the exclusive territories of others. Any Dealer who does infringe will be subject to severe penalties and the possible revocation of his franchise. All border line disputes will be resolved by the Home Office after the parties concerned had consulted with their Distributor.
Further, the franchise agreement executed by each dealer provided that
The parties recognize that the DEALER must confine his sales and service efforts to the area for which the franchise is granted * * *
The franchise agreements of distributors contained similar language.
Defendants concede the above but maintain there is no violation of our Antitrust Act because an exclusive territory is an absolute necessity to sell franchises. It argues that territorial divisions are necessary to compete with others in the lawn care business, to prevent cut-throat competition amongst its dealers thereby enhancing the probability of their being profitable, and that Lawn King could not exist without an exclusive territory for each dealer and distributor.
The fallacy of defendants' arguments is that Lawn King seeks to set itself up as the party to decide if competition within a territorial sector is or is not desirable, again arguing for a "rule of reason" approach. This argument has already been met. In United States v. Topco Associates, supra, some 25 small and medium-sized supermarkets sought to justify a territorial or market division by arguing that in limiting their freedom to compete with one another, it promoted the greater good by fostering competition between the Topco members and other large supermarket chains. The court said:
But * * * Topco has no authority under the Sherman Act to determine the respective values of competition in various sectors of *229 the economy. On the contrary, the Sherman Act gives to each Topco member * * * the right to ascertain for itself whether or not competition with other supermarket chains is more desirable than competition in the sale of Topco-brand products. Without territorial restrictions, Topco members may indeed "[cut] each other's throats" * * *. But, we have never found this possibility sufficient to warrant condoning horizontal restraints of trade. [405 U.S. at 610-611, 92 S.Ct. at 1135]
Defendants urge that Topco Associates does not apply because it involves a "horizontal" restraint, in contradistinction to this case which involves a "vertical" restraint. But the restraints here as to exclusive territory are at the same market level and are essentially horizontal in nature, as was Topco. A case on practically "all fours" is United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Schwinn, a bicycle maker with one-seventh of the market, sold primarily through 22 wholesale distributors, who could sell other brands. Distributors were assigned specific territories and could sell only to dealers within that territory. There were 5,000 to 6,000 dealers (who also could sell other brands but were required to give Schwinn bikes at least equal prominence), who were franchised only as to a specific territory or location. Each dealer could purchase only from the distributor in his area and could sell only to consumers, not unfranchised dealers. As the court said:
We are here confronted with challenged vertical restrictions as to territory and dealers. The source of the restrictions is the manufacturer. [87 S.Ct. at 1862]
The court explained that "sound business reason or motive" cannot be determinative, and then said:
* * * where a manufacturer sells products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results * * *. Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of *230 loss to another, he may not reserve control over its destiny or the conditions of its resale. [Id. at 1865-1866]
The opinion goes on to explain that if the manufacturer retains ownership of the goods, the inflexibility of the per se rule would probably give way to the "rule of reason" analysis. As noted above, for other than the combine, Lawn King parted with title and dominion of all equipment and supplies.
This court does not find it significant that Schwinn dealt with goods, whereas here we are dealing with "services." But one caveat the United States Law Week of March 15, 1977 (45 L.W. 3609) made reference to a GTE Sylvania Corp. case which was then being argued before the United States Supreme Court, which may result in a reexamination of the holding in the Schwinn case.
I am satisfied beyond a reasonable doubt that both defendants are guilty of the offenses of allocating to each distributor and dealer a specific and designated territory and of threatening and coercing them not to conduct any business outside of their territory.
In view of my findings as to price fixing and allocation of exclusive territories, I enter a verdict of guilty against both defendants on count 2.

Tying Arrangements
The State charges illegal "tying arrangements" in counts 3 through 6, inclusive:
For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. [Northern Pacific Ry. Co. v. United States, supra at 356 U.S. at 5-6, 78 S.Ct. 518]
In this case the dealers agreed to purchase certain items (chemicals, seed, tractor, trailer and advertising) as a condition of Lawn King's sale or lease to dealers of other items *231 (the Lawn King name, logo and combine). The latter is the "tied product" and the former the "tying product."
The Landmark case is Northern Pacific Ry Co. v. United States, supra. Northern Pacific sold lands with the condition that the purchaser ship its product over Northern's railroad lines. The vice of such an arrangement was that
* * * "tying agreements serve hardly any purpose beyond the suppression of competition" [case cited]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." [case cited]. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product. * * * [78 S.Ct. at 518-519]
"Sufficient economic power" was defined as nothing more than anything that could "impose an appreciable restraint on free competition in the tied product." Id. at 521.
The doctrine has been discussed in innumerable cases. But a case with some similarity is Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9 Cir.1971), cert. den. 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). In exchange for the license granting the franchise and the right to assume its identity, adopt its business methods and market food under its trademark, Chicken Delight required its franchisees to purchase a specific number of cookers, fryers and certain supplies and mixes exclusively from Chicken Delight. Defendant argued that this was a single, package deal. Thus, it was argued we cannot separate the items and label some the tying and others the tied products. But the court held that cookers, fryers, supplies and mixes were separate and distinct items from the trademark and franchise license, which it found to be "tying items."
There, as here, defendant urged immunity from the antitrust laws because preservation of good will and the business *232 itself compelled such an arrangement to assure the public of adherence to the highest quality of product sold by the dealers. The court's short answer was that it "is to the system and the end product that the public looks with the confidence that established goodwill has created," and this "in no way requires the forced sale by the franchisor of some or all of the component articles." Id. at 49. Put simply, if concerned with the quality of the end product, a defendant should set standards for the items that go into the end product, but permit the franchisee to purchase wherever he wishes. There is no need to require that he purchase solely from the franchisor.
Lawn King also argues that it does not possess "sufficient economic power," which it equates with "market dominance." But "economic power" to sustain a per se tying claim is not synonymous with a monopoly or "market dominance."
This standard of "sufficient economic power" does not * * * require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakenly clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 502-503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).
It is now clear that sufficient economic power is to be presumed where the tying product is patented or copyrighted. United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed. 2d 11 (1972); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed.2d 20 (1947).
* * * [W]e see no reason why the presumption that exists in the case of the patent and copyright does not equally apply to the trademark. [Siegel v. Chicken Delight, Inc., supra at 50]
I find Siegel to be dispositive here. It is clear that Lawn King possessed "sufficient economic power" to compel each *233 dealer to agree to purchase additional items (i.e., tied items) as a condition of acquiring the tying items. The trademark alone would be sufficient. But it is clear that defendants possessed a not insignificant share of the lawn service field, no matter how such field is defined. Certainly, Lawn King was one of the three largest lawn care companies in New Jersey.
Turning to the facts. Lawn King is a trademark. Its logo was registered with the United States Patent Office in September 1970. The evidence is uncontradicted that each dealer entered into a franchise agreement with the understanding that they would receive the use of the Lawn King name, its logo and the combine. I find these to be the "tying items."
What are the tied items? The State lists in the indictment: (1) trailers, (2) tractors, (3) advertising agencies, (4) chemicals and seed, (5) cooperative advertising arrangements, and (6) formats and advertising procedures.
I deal with the trailers and tractors together. These were acquired by the dealer at inception as part of a "package deal." The dealer paid a flat price, initially $7,500, and received in return a trailer and tractor, together with other items.
The tractor was a Kaydet model purchased by Lawn King directly from International Harvester Company. There was nothing unique about it, and the same model could have been purchased from any International Harvester sales agent. The tractor was used to pull the combine over the lawns.
The trailers were manufactured in New Jersey by an independent engineering firm. Again, there was nothing unique about the trailer, and it was used to carry the tractor and combine on the roadway and was pulled by a truck or van. The testimony was that anyone with average mechanical skills could duplicate it.
Lawn King said that it provided the trailer and tractor so that each dealer could present the same neat appearance *234 to the public, and the same logo and painting could be applied to each. There was no cost breakdown of what was paid for each item at purchase, but the State suggested that defendants made a profit on each such sale.
With a single exception, the dealers testified that they took what was offered, raised no objections, and indeed expected defendants to provide them with the equipment necessary to commence business. Most would not have known where to go to obtain similar equipment. The one exception was a Mr. Crossman, who said he already had a trailer. He asked and received permission to use his own and was given a $1,200 credit.
Under these circumstances how can we say that defendants compelled each dealer, as a condition of receiving the tying items, to purchase the trailer and tractor? Should we impose upon defendants the affirmative duty to advise each dealer that he could reject defendants' equipment and go out and purchase his own? I think not. As said in Capital Temporaries, Inc. of Hartford v. Olsten Corp., 506 F.2d 658-662 (2 Cir.1974), "There can be no illegal tie-in unless unlawful coercion by the seller influences the buyers choice." The coercion can be either from threats of cancellation of a relationship, Advance Business Systems and Supply Co. v. S.C.M. Corp., 415 F.2d 55 (4 Cir.1969), cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970) or from "actual coercion," such as forcing over objection. Ungar v. Dunkin' Donuts of America, Inc., 531 F.2d 1211 (3 Cir.1976), cert. den. 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).
Here we have a confluence of silence by defendants and appreciation by the dealers that Lawn King supplied the trailer and tractor.
I am not satisfied beyond a reasonable belief that "coercion" existed here. I enter a verdict of not guilty as to both defendants on counts 3 and 4  one count alleging an illegal tie-in sale of a trailer, the other of a tractor.
*235 Count 5 alleges an illegal tie-in arrangement in that distributors and dealers "were required to purchase their advertising from sources selected by Lawn King, Inc. as a condition" for remaining as franchisees. It was charged that this denied franchisees the free choice to select their own "advertising agencies" and denied the latter free access to this market.
Initially, it is difficult to know what the indictment means when it refers to "advertising agencies" since there was an absence of any testimony that any franchisee sought and, indeed, had the financial ability to afford an advertising agency of his own. The only party who retained an advertising agency was Lawn King. It negotiated and paid for all advertising lay-outs and formats, which it supplied to its franchisees. Once received, the franchisee would be responsible for its printing and circulation. While it is true that there was some suggestion in the proofs that defendants required dealers to use only company-approved printers and mailers, the indictment speaks in terms of "the purchase [of] advertising" and preventing dealers from choosing their own "advertising agencies." The two are not the same. I am of the impression that what we have is an inartfully drawn count 5.
I would note that there is no evidence that defendants had any interest in, or profited from, any income so derived by any advertising agencies. Dealers were not required to advertise, but if they did, they were required to use company-approved formats so as to assure a uniform and high quality. See more on this infra. Franchisees were permitted to make suggestions with respect to advertising lay-outs. Occasionally they were accepted.
There is absolutely no evidence to support the allegations of count 5. Accordingly, I enter a verdict of not guilty on count 5 as to both defendants.
Count 6 charges that franchisees were compelled to purchase chemicals and seed through the Lawn King distribution system. This charge has merit.
*236 Initially, the franchise agreement provided that
The parties recognize that the DEALER must * * * use only such products in the equipment that are furnished and sold by the COMPANY.

* * * * * * * *
DEALER hereby agrees to purchase from the COMPANY or from such sources as shall be approved by the COMPANY in writing, all products, raw materials and supplies for the conduct of such business.
Sometime in late 1971 or early 1972 defendants recognized the illegal restraints imposed by such agreement, so it was amended to read:
All chemicals * * * grass seeds and similar products used by the DEALER * * * shall either be purchased from the COMPANY, an official COMPANY DISTRIBUTOR or any other source approved by the COMPANY. * * *
A strict procedure is then set out for obtaining approval of purchases from other sources. The evidence did not disclose defendants ever approving purchases from outside sources in spite of requests. One reason for refusals was that the supply sources submitted by the dealers did not have stocked all of the chemicals and seed needed  and defendants believed this was essential.
Defendants argue that this procedure was essential to maintain quality control; otherwise, some dealers would cut corners and purchase chemicals and seed of an inferior quality. It was acknowledged that defendants had retained as a consultant Professor Henry W. Indyk, a specialist in Turf Grass Management at Rutgers University, to recommend various types of chemicals and seed, conduct training sessions for Lawn King dealers, and furnish articles for Turf Talk, a company bulletin circulated among franchisees. While on a monthly retainer, he conceded that he had a duty to supply this same information to the public free of charge. He testified that the chemical and seed mixes he recommended to Lawn King were precisely the *237 same mixes he recommended to the public. A dealer could obtain his mixtures free of charge. There was no need to purchase exclusively through the Lawn King system to obtain his advice. It is significant that defendants never asked Professor Indyk to test any chemicals or seed.
Quality control could be attained merely by setting standards for the chemicals and seed to be purchased. Several of the suppliers testified that they would sell directly to dealers (although one testified it would do so only with Lawn King's approval). In this way the dealer, at least on bulk purchases, could save the 20% mark-up commission that was paid to the distributor and the additional 20% mark-up commission paid to Lawn King.
Defendant's assertions of concern for quality control did not have a ring of truth. Not once did defendants ever make a spot inspection of a lawn to ascertain if quality was being maintained. Samples of a lawn were never sent to Professor Indyk to test. Defendants did not provide special education on how to service difficult lawns, but instructed dealers to follow the "standard procedure." Indeed, the only personalized attention a lawn owner received was a determination of whether his lawn was "sunny or shady." Other than that, a lawn received the same treatment, whether located in the hills of Sussex, the green plains of Somerset or the sandy shores of Monmouth.
Defendants denied that dealers were coerced to buy within the Lawn King system and pointed to evidence that many dealers on occasion purchased elsewhere. But this almost always occurred without the knowledge or approval of defendants. Indeed, because of concern that dealers were buying elsewhere, defendants are about to computerize purchases. Defendant said this was to better determine its future needs, but I find that a significant reason was to monitor dealer purchases to ascertain if they are buying elsewhere.
Also, defendants' statements bespoke coercion. Joseph Sandler said to Teitelbaum: "Listen to what I'm saying. I have the right to say * * * which chemicals you use * * *." *238 Also, when Gruer, a dealer, failed to pay an advertising bill, Lawn King sent a letter to Rodgers, their distributor, which said:
J & M Gruer has abused the credit extended him by not sending us the checks as scheduled for T.V. payments.
He is to receive no further chemicals until payment in full in the amount of $1,500 is received.
It is of no moment that Gruer's franchise was not revoked. The vice is the mere threat of revocation or business harm which defendants could exert by depriving a dealer of the necessities of doing business. If Gruer could purchase neither within nor without the Lawn King system, he was for all intents and purposes out of business. He was compelled to capitulate to defendants' demands, whether reasonable or unreasonable.
Again, defendants point to the franchise agreement which on its face permits a dealer to buy elsewhere if he complies with the requirements therein. They note that no dealer ever had his franchise revoked or suspended for purchasing from others. The response was provided by Mansericci, a dealer:
What did Mr. Sandler say with respect to his reason for wanting to put you out of business for exercising your right under the contract [to buy chemicals from others]?
He said to us, his word  "contract, shomtract". He didn't care what it said, we were going to do as he said  buy the chemicals from him  or he was going to put us out of business.
From all of the evidence I am satisfied beyond a reasonable doubt that franchisees were required to purchase their chemicals and seed needs through the Lawn King distribution system as an illegal tie-in arrangement. I find both defendants guilty under count 6.

Conspiracy to Boycott
Count 7 charges defendants with conspiring with Lebanon Chemical Corp to deny Lawn King dealers the right *239 to purchase chemicals directly from Lebanon. This denied dealers full and free access to the market for chemicals at a lower price and constituted a boycott in restraint of trade.
Defendants concede that an antitrust violation would exist if they and Lebanon entered into such an agreement to boycott a franchisee. But both defendants and Lebanon vehemently denied any agreement.
What the evidence did show was that it had been Lebanon's policy for over 50 years to refuse to deal with the customers of its major buyers  this on the basis of a legitimate business practice that time has proven to be sound. Lawn King was definitely one of its best customers. This was the testimony of every Lebanon employee, all called as State's witnesses. While there is evidence that defendants were aware of this policy of Lebanon and sought to reap the benefits thereof, there is no direct testimony that defendants "knowingly" instigated or conspired with Lebanon to boycott the Dealers.
This court is asked to infer that in spite of this clear testimony to the contrary, a secret agreement to boycott actually existed. I cannot do so. Some inference might be there, but not proof beyond a reasonable doubt. I find both defendants not guilty on count 7.

Cooperative Advertising and Restraint on Alienation
Count 1 is really a pyramiding of the elements of counts 2 through 6, with the additional charges that franchisees were required to pay for "cooperative advertising arrangements," to follow prescribed "formats and procedures" in their individual advertising, and were restricted in their freedom to sell their franchises.
As noted hereinabove, count 5 is somewhat imprecise. It charges that franchisees were required "to purchase their advertising from sources selected by Lawn King." But franchisees never purchased advertising  only defendants did this. Rather, the franchisees, as alleged in count 1, were *240 supplied with formats and glossies which they were required to use, without change, in their individual and local advertising. Defendants selected and paid for the lay-out from an advertising agency. By this procedure defendants prescribed a uniform, advertising format and each franchisee benefited, without cost, from the services of a professional advertising agency.
The disadvantage to the franchisee is that he was prohibited from inserting his own name in his advertising  this in spite of the fact that he was presumably an independent businessman. By this seemingly innocuous procedure each franchisee was foreclosed from promoting himself and compelled to use his funds to promote Lawn King. The infringement upon the franchisee's freedom and restraint upon his right to do business as he chooses is obvious. As one dealer, Gruer, testified when speaking of this and other restrictions:
When I went into business, I was told of my going to be an independent businessman and here I was working in a company doing * * * it was not my business. I could not do anything on my own. Everything I was told to do, and after a while you get sort of disgusted with it * * *
A similar circumstance prevailed with respect to "cooperative advertising." The franchise agreement provided that advertising would be conducted through television and major newspapers, and all would share in the cost. This advertising obviously covered the territory of many dealers. Distributors coordinated county-wide advertising and Lawn King when the circulation or listening area covered several counties. The franchise agreement provided that the decision to advertise would be made by a majority vote of the franchisees, but all must pay. The cost is shared equally by all franchisees within the affected area, regardless of their sales, number of homes serviced, their financial ability to pay, or their wishes to advertise.
Defendants said that advertising was the life-blood of their business. This justified for them whatever pressures were put *241 upon franchisees, although it is maintained that there was no coercion by defendants. Decisions of how and when to advertise were made by a majority vote of the franchisees, and defendants say that pressure, if any, was exerted by other franchisees and not by them.
Many dealers were strongly opposed to advertising through the mass media and felt that the true beneficiary thereof was Lawn King, which was able to sell more franchises as a result of such widespread advertising. Most dealers were of the opinion that local advertising, whether door-to-door brochures or in local newspapers, were the most effective for them. They perceived little benefit from advertising on television or in New York City newspapers.
Again we have what appears to be a clever scheme whereby so-called independent dealers were compelled to finance the advertising programs of Lawn King. Refusal to pay one's share of cooperative advertising brought down the wrath of defendants. See, for instance, a letter to Gruer's distributor directing that Gruer receive no further chemicals until he paid his cooperative advertising charges.
Count 1 also charges that franchisees were restricted in their freedom to sell their franchise. The agreement did give Lawn King a "RIGHT OF FIRST REFUSAL." This is not unusual. But defendants went further and prohibited a franchisee from advertising the sale of his franchise by using his name. Apparently defendants believed that such advertising would adversely affect the success image of a Lawn King franchise which it was promoting and, further, purchasers might acquire existing franchises rather than new ones. Defendants always offered their aid in acquiring a buyer, but one has to wonder whether new buyers would be directed to an existing franchise or a new one. Thus, a Lawn King franchisee was severely hampered in his ability to dispose of his franchise. The fact that there is no evidence that defendants ever actually prohibited the sale of a franchise is not salient; it is the power to curtail or impede alienation, especially coupled with the *242 ability to discourage a prospective buyer by individual suggestions that he would not be welcomed in the Lawn King organization, that is the true measure of the restraints imposed.
This court is satisfied beyond a reasonable doubt that both defendants did restrain trade and commerce as charged in count 1, and enters a verdict of guilty against both.

Special Exemptions
Defendants urge two final grounds for dismissal of the indictment: one because of the new industry or new business doctrine enunciated in United States v. Jerrold Electronics Corp., 187 F. Supp. 545 (E.D. Pa. 1960), aff'd per curiam, 365 U.S. 3, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), reh. den. 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200 (1961); the other because a franchise operation should be accorded special treatment or an exemption from the antitrust laws, pursuant to Ungar v. Dunkin' Donuts of America, Inc., supra.
The Jerrold case appears to be unique. This court has not found another case with a similar pronouncement. Jerrold devised a unique and new television booster in the late 1940s. Considerable scientific knowledge was necessary to install and maintain the equipment, so Jerrold marketed only through specially trained distributors. "Widespread chaos" would arise if Jerrold sold indiscriminately, and the capital necessary to start a system was substantial. If a rash of unsuccessful systems occurred, the community antenna system (which was of very recent origin) could flounder and interest in the system wane. Thus, "[n]ot only Jerrold's reputation but the growth of the entire industry was at stake during the development period." Id. at 556.
Since the history of the industry was brief and defendant's position therein would not require prolonged investigation, *243 the court did not apply any per se rules and applied an analysis of the "rule of reason" approach. It concluded that Jerrold's policy at inception was reasonable to launch a new business with a then highly uncertain future. But similar policies after the period of inception were found to be Sherman Act violations.
Lawn King was incorporated in 1970 and says that up to the date of the indictment, June 15, 1973, it was still in its formative stages and should be accorded immunity similar to Jerrold. I disagree. The facts are dissimilar. Jerrold was a pioneer in an entirely new industry. Lawn King was not. Jerrold's business was complex and required a high degree of scientific knowledge. Lawn King's did not. If Jerrold failed, an entire industry might collapse. Lawn King did not occupy a similar position. Jerrold's business required substantial capital. Lawn King's did not.
There are several significant factors which distinguish Jerrold, and this court perceives no basis upon which its narrow and peculiar holding should be applied here.
Defendants' final argument of special treatment, if not exception, for a franchise system is more troublesome. As our economic system expands and becomes more complex, the opportunities available to an ordinary citizen to attain the American dream of success and wealth have diminished. The large corporations possess vast scientific resources and the monetary reservoir to blunt, if not destroy, competition. How can the citizen of the 1970s become a free and independent businessman? One of the few avenues available is to participate in a franchise system, which provides a "turn-key" operation. The benefits to the individual were succinctly described in Ungar:
Typically, Dunkin' Donuts provides its franchisees with a "turn-key" operation. It selects suitable sites for doughnut shops and either purchase or leases them. It builds a doughnut shop and offers the prospective franchisee a lease on the land and building. It also offers to sell him the equipment needed to operate the shop * * * it is this package deal aspect of the franchise that often *244 attracts the prospective franchisee: the new businessman has only to turn the key and he is in business.
The franchisee needs no technical know-how, but can rely upon the franchisor to instruct him how to run his business, where to obtain all of his needs, and to provide advice whenever a problem arises. He immediately becomes part of a large, and often nationwide, organization. This is a great mental and emotional comfort to many. All one needs is a relatively small capital fund, a willingness to work hard and a bit of luck. The restraints of trade, whether as to territory, price or tie-in sales, are welcomed, at least initially. The benefits to both the franchisee and the public are obvious:
1. Individuals of modest means are provided an opportunity to go into business for themselves.
2. An individual's risk of failure is reduced because expert advice is available.
3. One's risk of loss is limited.
4. An alternative to economic concentration of wealth in the large corporations is provided because the wealth will be in many small businessmen.
5. The consumer benefits because a mobile public is provided with a standardized product.
As several opinions have noted, while the restraints at inception appear reasonable, after success has arrived they become burdensome. When a franchisee willingly accepts the benefits of restraints at inception, should he be permitted to complain after success? But see Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139-140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982, 990 (1968), which argues that participation by these franchisees may not be voluntary in a meaningful sense because they did not seek each and every clause of the agreement.
If a line is to be drawn  where? Should we immunize all franchising operations? How do we define such a system? The problems are many.
*245 While this court has some sympathy with this argument, in spite of Dunkin' Donuts, I cannot perceive any legislative intent in support thereof. Clearly this exemption should not be ordained by a trial court. Relief must be afforded at an appellate level, or, preferably, by the Legislature. For these reasons this court must reject defendant's arguments.

Summary
I find the New Jersey Antitrust Act to be constitutional and applicable to this case. Both defendants are guilty of counts 1, 2 and 6, and not guilty of counts 3, 4, 5 and 7.