Bent E. MORTENSEN et al., Plaintiffs,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION et al., Defendants.

Civ. A. No. Civil 1763–73.

United States District Court, D. New Jersey.

July 21, 1978.

604

Robert H. Jaffe, Springfield, N. J., for plaintiffs.

Franz J. Skok, Johnstone & O'Dwyer, Westfield, N. J., for defendants.

## OPINION

COOLAHAN, Senior District Judge.

Several motions brought by plaintiffs are before the Court. The nature of this litigation and its factual context are in general adequately set forth in *Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977), and in the decisions of this Court dated August 20, 1975, and November 3, 1977. Additional procedural developments and facts will be mentioned in the discussion of each motion.

### Restated Motion for Class Action Determination

Plaintiffs' restated motion for class action determination was filed May 3, 1978.

It follows two prior motions seeking class action certification. The first motion, filed on January 3, 1975, was considered by the Court at the same time as defendants' motion for summary judgment filed on February 14, 1975. Since the complaint was dismissed for lack of jurisdiction, no decision was made on plaintiffs' motion.

Subsequently the Court of Appeals reversed the Court's dismissal and remanded for consideration of a stay of the action pending the filing and outcome of proceedings before the Federal Home Loan Bank Board ("FHLBB" or "the Board"). Plaintiffs filed a motion on June 23, 1977, seeking *inter alia* an order denying a stay of proceedings and an order granting class action certification. However, the parties requested that the Court decide the issue of a stay and certain other matters first and defer decision of the class action question. *See* Opinion filed November 3, 1977, at 2.

The Court now has before it plaintiffs' restated motion filed May 3, 1978. Plaintiffs rely upon and refer the Court to the briefs, affidavits, and pleadings previously submitted as well as to plaintiffs' brief in support of their motion for an order finding a private cause of action under FHLBB regulations. Defendants also rely on the briefs and affidavits submitted in connection with the prior motions for class action determination and for summary judgment.

1. Defendants have conceded that a proposed class of several thousand in number makes joinder of all members impracticable. *See* Defendants' 2/11/75 Class Action Br. at 2. Defendants also have not contested the adequacy of representation. Defendants' objections on grounds of lack of typicality and commonality are essentially the same. *See id.* at 8.

2. Point I of defendants' brief argues on several grounds that the amended complaint fails as a matter of law to state a claim for violation of antitrust laws. However, the Court does not now have before it a cross-motion to dismiss plaintiffs' complaint or the proposed class action complaint. Furthermore, it is usually not proper to determine a motion for class action certification by considering whether the complaint states a cause of action or by conducting a preliminary inquiry into the merits. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Kahan v.*

Plaintiffs originally sought injunctive relief and, accordingly, class action certification pursuant to Fed.R.Civ.P. 23(b)(2). However, defendants abandoned the closed attorney plan effective June 15, 1977, and plaintiffs therefore request certification pursuant to Fed.R.Civ.P. 23(b)(3). *See* plaintiffs' Br. at 25.

Plaintiffs must carry the burden of meeting the prerequisites to class action certification in Rule 23(a) and the additional criteria of Rule 23(b)(3). The critical dispute is whether plaintiffs have satisfied the predominance criteria of 23(b)(3), that is, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." [1] Since several motions depend on whether the antitrust claims may be asserted on a class basis,[2] it will be considered first.

### A. Tying Claim

To establish a per se illegal tie-in, plaintiffs must prove three things:

". . . First, he must establish that the conduct in question was a tie-in: 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.' *Northern Pacific Ry. v. United States, supra,* 356 U.S. [1] at 5, 78 S.Ct. [514,] at 518, 2 L.Ed.2d [545] at 550.

*Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied, sub nom. Glen Alden Corp. v. Kahan,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). *But cf.* note 12, *infra* (certification properly denied when no doubt as to failure to state claim).

Defendants' motion brought in February, 1975, for summary judgment or for dismissal for failure to state a claim raised several grounds, some of which have been renewed in opposition to the motion for class action certification. This Court in August, 1975, dismissed the Sherman Act claims for lack of jurisdiction and consequently did not reach the merits of defendants' other arguments. The Court of Appeals subsequently reversed on the jurisdictional point. Since neither this Court nor the Court of Appeals has ruled on defendants' other assertions, defendants may not be foreclosed procedurally from presenting them in the future.

Second, he must establish that the seller 'has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.' *Ibid.* at 6 [78 S.Ct. 514.] And third, he must establish that 'a "not insubstantial" amount of interstate commerce is affected.' *Ibid.*"

*Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1223–24 (3d Cir. 1976).

The first element of a tying violation has several parts. There must be two separate products, a tying and a tied product. Both products must be offered for sale to a purchaser, and the sale of one must be conditioned upon the purchase of the other.

Plaintiffs allege that the tying product was the mortgage loan from First Federal Savings & Loan Association ("First Federal") and the tied product the legal and title services of Johnstone & O'Dwyer. According to plaintiffs' argument defendants led prospective borrowers to believe that Johnstone & O'Dwyer's services were for sale and that they had to purchase the legal and title services of Johnstone & O'Dwyer in order to secure First Federal's loan commitment. Plaintiffs also argue that the defendants collectively should be considered as the "seller" even though First Federal sells credit and Johnstone & O'Dwyer sells legal services. In this way, the tying allegation is made to correspond to the elements listed in *Ungar* where a single seller offers for sale two products and conditions the sale of one on the purchase of the other. *Ungar, supra,* 531 F.2d at 1224.

Defendants rely on *Forrest v. Capital Building & Loan Association,* 385 F.Supp. 831 (M.D.La.1973), *aff'd per curiam,* 504 F.2d 891 (5th Cir. 1974, *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975), and argue that the only product offered for sale was the loan by First Federal, and, since it was the only product offered, there could not logically be any tying violation. Specifically they contend that the legal services of Johnstone & O'Dwyer were not offered to borrowers, and that First Federal's loan could not have been conditioned on borrowers contracting

or purchasing services which were not offered to them. They believe the facts will show that Johnstone & O'Dwyer's services were purchased only by First Federal, and that borrowers paid First Federal the cost of the legal services in accordance with federal banking regulations. Just as First Federal charged borrowers for other "components" of the loan, including a credit check, appraisal report, and amortization schedule, so First Federal charged borrowers for Johnstone & O'Dwyer's services.

If the facts are as defendants contend, then according to *Forrest* and *Foster v. Maryland State Savings & Loan Association,* No. 76–1455 (D.C.Cir., June 12, 1978), a decision rendered after briefs were submitted, there is no antitrust tying violation. In *Forrest,* the plaintiffs, several attorneys, stipulated that the contested legal services were not for sale to prospective borrowers and were contracted for by the defendant building and loan associations as services necessary to consummate the loan. Moreover, the parties stipulated that borrowers were not prohibited from selecting and employing their own counsel if they wished. The district court held that since two products were not for sale to the borrowers—the only one being home and commercial credit—proof of a tying arrangement was impossible. The Fifth Circuit affirmed on the basis of the lower court's opinion.

In *Foster,* the defendant, a federally insured mutual savings and loan association, required borrowers to pay an attorney's fee charge only if they employed counsel other than the law firm retained by the association. Plaintiffs were a class of borrowers who employed their own counsel and, consequently, were assessed a charge for the lender's attorney's fees. The court sustained a directed verdict, finding that "separate products were not involved in plaintiffs' 'purchase' of the residential property loans" and that the attorney's fee charge was "an incidental and inseparable part of their 'purchase' of the loan, rather than the 'purchase' of a tied product." Slip op. at 5–6. Finding *Forrest* persuasive, the

court stated that "[i]ncidental services purchased by the seller (lender) for legitimate business reasons cannot be viewed as a separate (or tied) product, merely because the buyer is charged for them." Slip op. at 8 (footnote omitted).

To satisfy the two-product requirement, plaintiffs must prove the opposite of what was stipulated in *Forrest.* Plaintiffs must demonstrate that defendants can collectively be considered a "seller" in relation to each borrower, that both credit and legal or title services were offered separately to prospective borrowers, that both were purchased or contracted for, and that legal services were rendered to borrowers, not only First Federal.

It should be noted that plaintiffs do not challenge per se the closed attorney arrangement allowed by federal banking regulations, as would be difficult given the holdings in *Forrest* and *Foster.* In fact, plaintiffs' claim tracks the Board's antitying regulation, 12 C.F.R. § 563.35, in its form prior to amendments effective September 30, 1976:

> "(a) No insured institution or director, officer, or employee thereof may grant any loan or extend any other service of the institution on the prior condition, agreement, or understanding that the borrower contract for any of the following with any specific firm, agency, or person:
>
> (1) Insurance (except insurance or a guaranty provided by a government agency);
>
> (2) Building materials;
>
> (3) Legal services, including title examination, and escrow and abstract services; and
>
> (4) Services of a real estate agent or broker.

> (b) The prohibition contained in subparagraph (1) of paragraph (a) of this section shall not be construed to prohibit an insured institution from refusing to grant a loan or extend any other service if the borrower wishes to contract, in connection with such loan or service, with a particular company, firm, agency, or person whose services, in such connection, are believed by the insured institution, on reasonable grounds to afford it insufficient protection.
>
> (c) The prohibition contained in subparagraph (3) of paragraph (a) of this section shall not be construed to prohibit the insured institution from requiring the borrower to pay an initial loan charge to reimburse the institution for legal services rendered to it by an attorney selected by the institution in connection with the processing and closing of a loan."

*See* P. Br. at 22; P. Br. to Permit Intervention, etc., 6/22/77, at 6 n. 1. A closed attorney arrangement is still permitted by the amended regulation. *See* 12 C.F.R. § 563.35 (1977). Thus, it appears that plaintiffs' claim is that defendants deviated from the antitying banking regulation and thereby also committed a violation of antitrust laws.

The Court does not believe that proof of the crucial legal issue of the two-product requirement presents common questions of fact sufficient to meet the "predominance" criteria of Fed.R.Civ.P. 23(b)(3). Contrary to the assertion only recently advanced by plaintiffs,[3] defendants have not changed their position and continue steadfastly to deny offering legal services for sale to borrowers and have "admitted" only that they used a closed attorney system provided for by federal banking regulations. Defendants maintain that they never required borrowers to purchase the services of Johnstone & O'Dwyer and did

---

**3.** Plaintiffs' brief states that defendants had "an admitted requirement" for borrowers "to use defendant Johnstone & O'Dwyer for legal and title services in connection with real estate transactions involving mortgage loan commitments of defendant First Federal" and that it was a "uniform policy . . . imposed on all borrower-members." (P. Br. at 29.) In contrast to the ambiguous term "use" employed in this part of plaintiffs' brief, elsewhere plaintiffs' brief argues that borrowers were required to *purchase* services from defendant Johnstone & O'Dwyer. *See, e. g.,* P. Br. at 6, 17, 21, 32.

not deny a borrower the right to use an attorney of his choice.

Plaintiffs' brief indicates that they understand *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), to mean that since proof of individual coercion is not required in this case, then class action certification must follow. The Court disagrees with the premise and the conclusion. The Court of Appeals stated in *Bogosian* that "once a plaintiff proves that a defendant has conditioned the sale of one product *upon the purchase of another,* there is no requirement that he prove that his purchase was coerced by the seller's requirement." 561 F.2d at 450 (emphasis supplied). In this case defendants deny offering borrowers Johnstone & O'Dwyer's legal services, much less conditioning the loan upon their purchase. As has been discussed above, plaintiffs must first prove the offer and purchase of these services. The Court cannot adopt plaintiffs' suggestion that it "assume" a crucial factual element of plaintiff's case:

> "Plaintiffs have alleged that under the direction and control of defendant Johnstone, the director, defendants have conspired to impose . . . an illegal tying arrangement whereby the grant of mortgage credit is used as a lever to compel the *purchase* of legal and title services from defendant Johnstone and O'Dwyer. Indeed, for the purpose of deciding the issue of subject matter jurisdiction, this Court assumed that . . . services are rendered by [defendants] to borrowers . . . and that they are compelled to accept them. . . . There has been no factual matter raised by defendants since August 1975 to counter the *continued use of this sound assumption* in the context of the instant procedural motion for class action certification."

4. The nature of plaintiffs' proof was mentioned at Bent Mortensen's deposition:

> "Q. Did they ever say anything that implied to you that independent counsel was not needed?
> A. No. The only way I gathered this was in the whole context of all the documents I received and the letters I received.

(P. Br. at 6, emphasis supplied.) *See* note 3, *supra.* The facts which plaintiffs must prove to show that legal and title services are for sale to borrowers are preliminary to the question whether they are compelled or coerced to purchase them.

Plaintiffs have argued previously that they will prove the deviation from an approved closed attorney system and the consequent antitrust violation primarily from the standard written documents which were used with the proposed class members.[4] (P. Br. dated 6/22/77 at 7; P. Class Action Reply Br. dated 3/21/75 at 13, 16–19, 27–28.) Plaintiffs contend that defendants' conduct was calculated to convey the impression to borrowers that only Johnstone & O'Dwyer could participate in the mortgage and title transactions and, furthermore, that if borrowers retained other counsel, it might lead to cancellation of First Federal's loan commitment, perhaps because Johnstone & O'Dwyer would find title defects it otherwise would have ignored. (P. Aff. filed Jan. 3, 1975, at ¶ 21.)

As for the documents, they are, however, neutral in their terms or convey an impression contrary to that alleged by plaintiffs. The form "Application for Loan" includes the following:

> "The applicant agrees to pay all appraisal fees, attorney's fees, search and other fees and disbursements including a survey, mortgage tax and recording fees connected with the examination of the property and the making of a loan. It is agreed that this Institution may reject or revoke any loan granted at any time prior to the actual payment of the principal *if* the examination reveals an unmarketable or defective title in fee, or should develop facts materially different from those stated in this application, or any other facts imperiling the security offered."

> Q. You received this impression from these printed letters or form letters or communications, written communications that Johnstone & O'Dwyer forwarded to you?
> A. Right."

*See* Mortensen Dep., June 4, 1974, at 249–50.

(P. Aff. filed Jan. 3, 1975, Ex. "C".) On its face, the application indicates only a charge for attorney's fees consistent with a closed attorney system. The next communication, the loan commitment letter sent by First Federal, states, "We are instructing our attorneys, Johnstone and O'Dwyer, . . to proceed with the search of this property." (*Id.* at Ex. "D".) See Appendix "A". The follow-up letter sent by Johnstone & O'Dwyer notifying borrowers of commencement of the title search, states in the first sentence, "This firm represents First Federal Savings & Loan Association of Westfield." (*Id.* at Ex. "E".) See Appendix "B".

Without need of going through every document, it is clear that the documents do not by their terms convey the impression that Johnstone & O'Dwyer's services are for sale to borrowers or that borrowers cannot retain counsel. While they do state that borrowers must pay First Federal's attorney's fees and that Johnstone & O'Dwyer will be coordinating the transaction for First Federal, the language puts a borrower on notice only of a closed attorney arrangement.

Whether a borrower reasonably concluded that defendants were offering for sale legal and title services (the two-product requirement) and requiring their purchase depends on defendants' conduct in each instance, as well as other variable factors. For example, in this case the deposition of plaintiff Bent Mortensen suggests that he did not believe Johnstone & O'Dwyer were his attorneys and that he chose to rely on First Federal's confidence in Johnstone & O'Dwyer's ability to close the mortgage and title properly.[5] Mortensen also indicated that he knew he could retain his own counsel and was not misled as to his right to counsel by any act or omission of defendant Johnstone & O'Dwyer.[6] In fact, an associate of the law firm representing plaintiffs in this case was present at the closing—allegedly as a mere observer—and a letter was sent on behalf of plaintiffs by that firm to Johnstone & O'Dwyer requesting a copy of the mortgage commitment and asking that a title insurance policy be obtained for plaintiffs.[7] Mortensen also stated that he had not been prejudiced or harmed in relying on Johnstone & O'Dwyer to look out for his interests as well as those of First Federal.[8] Furthermore, it should be noted that the actions of the real estate broker often shape the borrower's understanding of the role of the lender's attorney. For example, the broker in this case, not named as a defendant, assured plaintiffs that they did not need to retain counsel.[9] In sum, there is no common factual pattern upon which defendants' liability to the class can be determined. Distinguishing between transactions in which defendants carried out a closed attorney system from those in which it crossed the line into an illegal tying arrangement requires consideration of the facts of each case. Accordingly, class action certification is denied.[10]

5. Mortensen Dep., May 14, 1974, at 121–122, 166–171.

6. *Id.*, June 4, 1974, at 211–215.

7. *Id.*, April 9, 1974, at 16–26; Aff't of Bent Mortensen, filed Jan. 3, 1975, Ex. "I". See Appendices "C" and "D".

8. Mortensen Dep., June 4, 1975, at 215.

9. *Id.*, April 9, 1974, at 27, 38; May 14, 1974, at 171–172.

10. Defendants have also argued that neither plaintiffs nor the putative class members have standing to sue under § 4 of the Clayton Act. Section 4 requires a private plaintiff to have been "injured in his business or property" by the alleged antitrust violation. Defendants contend that injury to property means injury to only commercial or business property. There is a direct statement to that effect in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). *See In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 126 (9th Cir. 1973) (standing for injury to commercial property only). Whether plaintiffs not alleging commercial injury, such as consumers of retail goods, have standing is now being debated by the district courts. *Compare Reiter v. Sonotone Corp.*, 435 F.Supp. 933 (D.Minn. 1977) (granting consumer standing and certifying interlocutory appeal) *with Weinberg v. Federated Dep't Stores, Inc.*, 426 F.Supp. 880

## B. *New Jersey Antitrust Act*

■ Plaintiffs argue that the same reasoning which supports class action certification of the federal antitrust claims requires certification for the State antitrust claims pursuant to the New Jersey Antitrust Act, N.J.S.A. 56:9–1 *et seq.* (Supp.1977). The elements of a tying violation. under the statute appear to be essentially the same as those for a federal antitrust violation. *See State v. Lawn King, Inc.,* 150 N.J.Super. 204, 375 A.2d 295 (L.Div.1977); N.J.S.A. 56:9–18 (Supp.1977). Since class action certification of the federal tying claims has been denied, for the same reasons a class action designation of the State law tying claims is denied.

## C. *Price Fixing*

■ Plaintiffs have claimed that the amended complaint might be construed to assert a per se illegal price-fixing conspiracy.[11] Plaintiffs suggest that from their factual contentions they can allege that "the purpose of the tying arrangement of defendants was to fix prices for legal and title services required to be purchased from defendants Johnstone & O'Dwyer and Guardian." (P. Br. at 17.) Apparently plaintiffs contend that use of the economic power over the tying product to coerce a buyer to purchase the tied product and also to coerce its purchase at a certain price amounts to price fixing. The Court does not understand how restating the tying violation amounts to per se illegal price fixing. Horizontal price fixing by definition requires an agreement between competitors dealing in competing products in a relevant market. *See Evans v. S. S. Kresge Co.,* 544 F.2d 1184, 1192 (3d Cir. 1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). There is no allegation that Johnstone & O'Dwyer conspired with other offerors of legal or title services to fix the price of those services. As for a vertical restraint, there are no facts or even allegations suggesting a combination of persons at different levels of the market structure, such as manufacturers and distributors, for the purpose of fixing prices. Plaintiffs' reference to *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), is inapposite. *Goldfarb* held that a statewide minimum fee schedule for legal services enforced by the State bar associations against all attorneys offering those services was an illegal price fixing arrangement. The only fee schedule involved here is Johnstone & O'Dwyer's schedule of fees charged First Federal. In sum, plaintiffs' factual contentions do not amount to an allegation of price fixing and, consequently, class action certification for a claim of price fixing is denied.[12]

---

(N.D.Cal.1977) (denying standing). Because plaintiffs' motion for class certification has been denied on more settled grounds, it is not necessary to decide the standing issue at this time.

Also, since proof of the first elements of a tying violation precludes class action certification, consideration of the other elements is not necessary and the Court advances no position on their merits. *See* note 2, *supra.*

**11.** The Court did no more than acknowledge plaintiffs' contention in footnote 4 of its opinion of August 20, 1975, granting defendants' motion for summary judgment. The Court made no "preliminary finding" in support of plaintiffs' contention. *See* P. Br. at 17.

**12.** Although class action certification should not be denied even when it is doubtful that a cause of action has been stated, the Court does not believe that when a claim is frivolous, it is required to certify the class and have notice served on class members, only to await a motion to dismiss the claim. The full statement of the rule by the Court of Appeals for the Third Circuit in the leading case, *Kahan v. Rosenstiel, supra,* 424 F.2d at 169, supports the Court's position:

". . . The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action . . . and still be dismissed for failure to state a cause of action. As the 10th Circuit said in *Esplin v. Hirschi* [402 F.2d 94, 101 (10th Cir. 1968)], since the effectiveness of the securities laws may depend in large measure on the application of the class action device 'the interests of justice require that *in a doubtful case,* such as was presented here, when considered by the trial court, any error, if there is to be one, should be committed in favor of allowing the class action.' " (Emphasis added.)

### Amendment—Intervention—Discovery

■ Plaintiffs' motion to amend to add proposed defendants Demarest and Schmidt and the Collins' motion to intervene are also disposed of by the denial of the motion for class action designation. Demarest and Schmidt were not members of the Board of First Federal until after the closing on plaintiffs' home and loan, and therefore leave to amend is denied. *See* Opinion, Nov. 3, 1977, at 10. Proposed intervenors, Mr. and Mrs. Collins, obtained a mortgage from First Federal four years after plaintiffs, and given the prejudice likely to accrue against defendants from joint trial of such a different factual claim, the Court will not exercise its discretion in favor of intervention. *See id.* at 10.

Plaintiffs' motions for discovery and admissions are denied insofar as they pertain to issues and matters which would have been relevant had suit proceeded as a class action. The Court will consider the remaining parts of those motions and other discovery matters if the parties are still unable to agree.

### Prejudgment Attorney's Fees

■ Plaintiffs' counsel seeks an award at this time of part of the attorney's fees, now calculated to be in excess of $230,000, whether or not plaintiffs ultimately succeed on the merits. Counsel contends that this suit has been the "direct and proximate cause" of defendants' adoption of an open-attorney policy. Aff't R. Jaffe, May 15, 1978, at ¶ 5. The only ruling on any substantive matter that plaintiffs can now point to was the finding by the Court of Appeals that dismissal on jurisdictional

grounds for lack of sufficient interstate commerce was premature. *Mortensen v. First Federal Sav. & Loan Ass'n, supra,* 549 F.2d at 890. This ruling, plaintiffs' counsel argues, deterred defendants from continuing the closed-attorney plan. Aff't R. Jaffe, May 15, 1978, at ¶ 17. The affidavit submitted by defendants on this issue quite plainly establishes that business considerations were the cause of First Federal's change to an open-attorney plan, not the threat of this suit or any of its prior proceedings. A special committee of the Board of First Federal studied the problem of a reduced number of mortgage applications referred by brokers to First Federal. The committee report concluded that among other factors the closed-attorney policy discouraged brokers from referring borrowers to First Federal. *See* Aff't Charles Harrington, May 15, 1978. Aside from other defects in the theory of counsel's application, the Court finds no factual basis for an award, accepting *arguendo* plaintiffs' premises.

### Implied Private Cause of Action

Plaintiffs have requested an order determining that an implied private cause of action will lie for violation of the Board's banking regulations. There is a line of cases holding that enforcement of banking regulations promulgated by the Federal Home Loan Bank Board pursuant to the Home Owners' Loan Act of 1933, 12 U.S.C. § 1461, *et seq.* ("the Act"), is not limited to administrative proceedings by the Board. Both district and appellate courts have held that shareholder-depositors [13] and borrowers [14] are entitled to enforce the Board's

---

13. *See Kupiec v. Republic Fed. Sav. & Loan Ass'n,* 512 F.2d 147 (7th Cir. 1975); *Murphy v. Colonial Fed. Sav. & Loan Ass'n,* 388 F.2d 609 (2d Cir. 1967); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n,* 405 F.Supp. 819 (N.D.Ill. 1975). *Cf. Reich v. Webb,* 336 F.2d 153 (9th Cir. 1964), *cert. denied,* 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 800 (1965) (depositors represented by Board); *City Fed. Sav. & Loan Ass'n v. Crowley,* 393 F.Supp. 644 (E.D.Wis.1975) (Association representing members).

14. *See Gibson v. First Fed. Sav. & Loan Ass'n,* 347 F.Supp. 560 (E.D.Mich.1972) and 364 F.Supp. 614 (E.D.Mich.1973), *aff'd,* 504 F.2d 826 (6th Cir. 1974); *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n,* 499 F.2d 1145 (9th Cir. 1974); *Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n,* 496 F.2d 523 (2d Cir. 1974).

regulations on the theory that a private cause of action may be implied in their favor from the Act.

However, the decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), has cast doubt on the authority of those cases since it has been interpreted as establishing a more restrictive method of determining whether implication of a private cause is appropriate. *See* note 15, *infra.* According to *Cort,* four factors must be considered:

". . . First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . . —that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). The impact of *Cort* in this area has been before several courts, but for various reasons the issue was not resolved.[15] Consequently, the problem is one of first impression. The Court believes that it must follow the decisional law in this area unless it can be said that the reasoning of the prior cases is plainly at odds with the analysis mandated by *Cort.*

**15.** In *Goldman v. First Federal Savings & Loan Association,* 518 F.2d 1247 (7th Cir. 1975) (per Stevens, J.), the court did not decide whether a private cause of action was available to enforce a regulation governing prepayments because the regulation had not been violated in any event. The court, however, took note of the fact that the Board's enforcement powers might be exclusive in light of the decision in *Cort. Id.* at 1250 n.6.

*Cf. Schmidt v. Interstate Fed. Sav. & Loan Ass'n,* 421 F.Supp. 1016 (D.D.C.1976) (assuming private cause).

## Background

Defendant First Federal is a federally chartered savings and loan association organized pursuant to 12 U.S.C. § 1464(a):

"(a) In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations', and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States."

A federally chartered savings and loan association is entirely a creation of federal law and is subject to the Board's comprehensive rules and regulations concerning its powers and operations "from its cradle to its corporate grave." *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n, supra,* 499 F.2d at 1147. Numerous cases have held that federal law has preempted state law with respect to the internal operations of federally chartered savings and loan associations [16] and that the area is one appropriate for judicial construction of federal common law to fill in gaps between the Board's regulations.[17]

## Especial Benefit

Defendants argue that the Home Owners' Loan Act was passed for the especial

**16.** *See, e. g., Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n, supra,* 499 F.2d 1145; *City Fed. Sav. & Loan Ass'n v. Crowley, supra,* 393 F.Supp. at 655.

**17.** *See Murphy v. Colonial Fed. Sav. & Loan Ass'n, supra,* 388 F.2d 609. *Cf. Kupiec v. Republic Fed. Sav. & Loan Ass'n, supra,* 512 F.2d 147 (Board regulation preempts earlier federal common law).

benefit of only savings account holders, who depend on the fiscal integrity of the savings institution. The Court does not agree. Mortgage borrowers are also in the class especially benefited by the statute. The Act authorizes the Board to organize and operate savings and loan associations "in order to provide for the financing of homes" and requires the Board to give "primary consideration to the best practices of . . . home financing institutions." 12 U.S.C. § 1464(a). Commenting on a provision originally in the Act providing criminal penalties for improper, excessive loan charges, the Supreme Court stated:

> ". . . Congress was entitled not only to prevent misapplication of the public funds and to protect the officials concerned from being misled, but also to protect those who sought loans from being imposed upon by extravagant or improper charges for services in connection with their applications. This would be in the interest 'not only of themselves and their families but of the public.' "

*Kay v. United States,* 303 U.S. 1, 8, 58 S.Ct. 468, 472, 82 L.Ed. 607 (1938). *See* Home Owners' Loan Act of 1933, c. 64, § 8, 48 Stat. 134 (1933) (repealed 1948—corresponding current version at 18 U.S.C. § 1006). Borrowers are also considered members of the association and are entitled to vote with depositors, although with proportionately fewer votes. *See Kupiec v. Republic Fed. Sav. & Loan Ass'n, supra,* 512 F.2d at 152. While there are classes only remotely benefited by the Act,[18] borrowers and depositors are within the class for whose especial benefit the Act was passed.

Whether a specific section or regulation was intended for the especial benefit of borrowers is, however, an additional issue.[19] The provision that plaintiffs primarily rely upon is the antitying regulation, 12 C.F.R. 563.35, in its form prior to amendments effective September 30, 1976. See *Mortensen v. First Fed. Sav. & Loan Ass'n, supra,* 549 F.2d at 898–899. Following the remand to this Court for consideration of a stay pending administrative proceedings, plaintiffs asked the Board to intervene in lieu of conducting an agency hearing. The Board took the position that it was not necessary for it to intervene or institute agency proceedings because it understood from plaintiffs "that the Board's involvement is only sought to aid in the resolution of a dispute over . . . section 563.35 . . . as it existed in 1972." (*See* "Aff't of Counsel . . . in Light of the Positions Taken by FHLBB in Attached Letter Dated September 2, 1977," Sept. 9, 1977, Ex. "D".) Because the Board expressly reserved the option to reconsider its position if the current regulation became involved, plaintiffs amended their complaint to limit suit to the period prior to the effective date of the current regulation. *See* Opinion, Nov. 3, 1977.

■ Section 536.35 is obviously designed to protect borrowers from being coerced by the lender's power over mortgage credit. *Cf. Kay v. United States, supra,* 303 U.S. at 8, 58 S.Ct. 468. It is, therefore, possible to imply a private cause of action in favor of plaintiffs if the other three elements of the *Cort* test are satisfied. As will appear, the third factor of *Cort* requires that the Board indicate that referral to the district court is appropriate. While the Board has referred unamended § 563.35 to the Court, plaintiffs have not ascertained the Board's position on

---

**18.** *See McNeill v. Jacobson,* 55 Wis.2d 254, 198 N.W.2d 611 (1972) (no cause for borrower's creditor). *See also* note 19, *infra.*

**19.** *See Chevalier v. Baird Sav. Ass'n,* 371 F.Supp. 1282 (E.D.Pa.1974) (denying private

action for 12 U.S.C. § 1425; *Shaw v. Cook City Fed. Sav. & Loan Ass'n,* 139 Ga.App. 419, 228 S.E.2d 326 (Ct.App.1976) (denying private action for 12 U.S.C. § 1464(c)). *Cf. Valente v. Dennis,* 437 F.Supp. 783 (E.D.Pa.1977) (no private cause for excessive loan by national bank).

§ 545.6–10 [20] and 571.7(b).[21] Those regulations therefore are not properly before the Court and will not be considered further in terms of implying a private cause of action.

*Implicit Legislative Intent*

The Act does not explicitly provide for private enforcement of its terms or of the Board's rules and regulations. Enforcement, like creation and operation, is left to the Board. Until 1966 the sanctions available to the Board were limited to appointment of a receiver and revocation of an association's federally sponsored insurance. With the passage of the Financial Institutions Supervisory Act of 1966, Pub.L.No.89–695, 80 Stat. 1028 (1966), Congress gave the Board the power to issue cease and desist orders after issuing a notice of charges and conducting a hearing. *See* 12 U.S.C. § 1464(d)(2). The Board was also empowered to issue emergency temporary cease and desist orders without a hearing and was authorized to remove directors or officers for violations involving personal dishonesty. *Id.* § 1464(d)(3) and (4). Judicial review of the Board's orders was limited to the courts of appeals. *Id.* § 1464(d)(7). The legislative history [22] of the amendments reveals that Congress' purpose was to give the Board more flexible, less drastic enforcement measures in order to stop bad management practices or outright frauds that could lead to insolvency, thus avoiding the need for a take-over by a receiver. The congressional debates indicate a cautious

**20.** Section 545.6–10 prior to amendment in 1976 provided:

"No director, officer, or employee of a Federal association, and no person or firm regularly serving such association in the capacity of attorney-at-law, may receive from the association or from any other source any fee or other compensation of any kind in connection with the procuring of any particular loan from or by such association. Borrowers may be required to pay the necessary initial charges in connection with the making of a loan, including the actual costs of title examination, appraisal, credit report, survey, drawing of papers, closing of the loan, and other necessary incidental services and costs in such reasonable amounts as may be fixed by the board of directors; such necessary initial charges may be collected by the association from the borrower and paid to any persons, including any such director, officer, employee, attorney or firm rendering such services: *Provided,* That no discount, rebate, or commission on any such charge may be received by any director, officer, or employee of a Federal association, or by any person or firm regularly serving such association in the capacity of attorney-at-law, but such discounts, rebates, or commissions, when allowed as compensation for services performed, may be received and retained by the association. Upon the closing of the loan, the association shall furnish the borrower a loan settlement statement showing in detail the charges or fees the borrower has paid or obligated himself to pay to the association or to any other person in connection with such loan; and a copy of such loan settlement statement shall be retained in the records of the association."

In the current version the ambiguous language of the proviso has been eliminated and the regulation clearly allows the association to pay persons rendering services for which the borrower is charged. 12 C.F.R. § 545.6–10 (1977).

**21.** 12 C.F.R. § 571.7 (1977) provides in relevant part:

"(a) The Board has a paramount interest in the prevention and elimination of practices and conditions which adversely affect: The interests of members in insured institutions; the soundness of such institutions; the provision of economical home financing for the Nation; and the accomplishment of the other purposes of title IV of the National Housing Act, as amended.

(b) Among the practices and conditions which have such adverse effects are conflicts between the accomplishment of the purposes of title IV set forth in paragraph (a) of this section and the personal financial interests of directors, officers, and other affiliated persons of insured institutions. Conflicts of this type which have demonstrably resulted in such adverse effects are considered by the Board to be inherently unsafe and unsound practices and conditions. The Board accordingly holds that each director, officer, or other affiliated person of an insured institution has a fundamental duty to avoid placing himself in a position which creates, or which leads to or could lead to, a conflict of interest or appearance of a conflict of interest having such adverse effects."

**22.** *See* S.Rep.No.1482, 89th Cong., 2d Sess. (1966), reprinted in 3 U.S.Code Cong. & Admin. News, p. 3532 (1966); H.Rep.No.2077, 89th Cong., 2d Sess. (1966); Conference Rep.No. 2232 (1966).

approach to expansion of the Board's enforcement powers—particularly with respect to regulations which had not yet been promulgated.[23] The legislative history of the amendments does not show that Congress contemplated that the 1966 amendments would allow private plaintiffs to replace the Board by seeking injunctive or declaratory relief—the equivalent of a cease and desist order—much less to seek an award of damages.

Nevertheless, the legislative intent has come to be read differently when the Board refuses to institute cease and desist proceedings. In *Murphy v. Colonial Federal Savings & Loan Association,* 388 F.2d 609, 614 (2d Cir. 1971) (per Friendly, J.), the Court of Appeals concluded that Congress' "effort to create an effective system of sanctions would be hampered rather than forwarded by reading [the 1966 amendments] to paralyze the judiciary when the agency has refused to act." In *Murphy,* the Board had refused to institute proceedings to reverse an election of directors when the plaintiffs, shareholder-depositors, had been refused a membership list and lost the election. The Court of Appeals held that the basis of the suit was a Board regulation, that no jurisdictional amount was required because jurisdiction lay under 28 U.S.C. § 1337, that the election was invalid as a matter of federal common law, and that Congress intended parties to be able to pursue their "ordinary" judicial remedy of review of discretionary administrative actions

rather than requiring a suit against the Board for refusal to issue a notice of charges. *Id.* at 613, 613 n.5.

From a case in which federal common law was judicially created and enforced when the Board had found no violation of its regulations, the law came to be something quite different. In *Milberg v. Lawrence Cedarhurst Federal Savings & Loan Association,* 496 F.2d 523 (2d Cir. 1974), plaintiff borrowers were informed by letter from the Board's counsel that violations of regulations limiting escrow payments were dependent on the facts of each case and that the merits could be determined by the court. Relying on *Murphy,* the *Milberg* court held that since the Board had refused to act, a private right of action could be implied. Subsequent cases appeared to have accepted the formulation in *Milberg*[24] until the decision in *Cort.* Apparently the Board has adopted the procedure of exercising its discretion to confer causes of action under its rules, since it refers in its letter to plaintiffs in this case to the *Milberg* procedure as its "common practice." *See* Opinion, Nov. 3, 1977, at 4.

The hesitancy evident in the congressional decision to expand the Board's powers in 1966 appears to have been dispelled later since the Board's enforcement powers were not revoked or allowed to lapse. *See* note 23, *supra.* Moreover, Congress is presently considering a bill that would substantially enlarge the Board's authority.[25]

**23.** The Senate and House debates indicate that the purpose of the amendments was to enable the Board to head off bank failures by granting the Board enforcement powers that could be used quickly and that were flexible enough to be used as frequently as necessary. *See* 112 Cong.Rec. 20077, 20223 (1966); 112 Cong.Rec. 24980 (1966).

The House debate in particular shows the concern by many members that the Board's supervisory power might become excessive, especially because the Board had the authority to promulgate new regulations. 112 Cong.Rec. 24984, 24987, 25001. A House provision would have provided for the expiration of the Board's new powers in June 1968. *Id.* at 24985–86. Although the Conference Report extended the deadline to June 1972, in 1970 the time limit

was repealed. See Act of Dec. 31, 1970, Pub.L. No.91–609, 84 Stat. 1811.

Another proposed House amendment expanding the scope of judicial review of the Board's actions was defeated in part because of an unwillingness to let the courts second-guess the agency. *See* 112 Cong.Rec. 24997, 24999.

**24.** *See Goldman v. First Fed. Sav. & Loan Ass'n, supra,* 518 F.2d at 1250 n.6; *City Fed. Sav. & Loan Ass'n v. Crowley, supra,* 393 F.Supp. at 657. *Cf. Mortensen v. First Fed. Sav. & Loan Ass'n, supra,* 549 F.2d at 899, 900 n.31 (citing *Milberg,* but remanding on question of implied private action).

**25.** Both the House and Senate are considering bills which, if passed, would be the most comprehensive bank regulatory reform measure since the 1966 amendments. *N.Y. Times,* July

The history of the expansion of the Board's enforcement powers by congressional amendment and judicial construction becomes more significant when considered in the context of the structure of the Act. A congressional intent implicit in the statutory provisions to allow a private cause of action is sufficient under *Cort*. *Cort* emphasized that the degree of federal involvement in an area and, especially, the articulation of the federal concerns by vesting rights in the class to which plaintiffs belong are persuasive factors favoring implication—absent an explicit indication of congressional purpose to deny it. *Cort v. Ash, supra,* 422 U.S. at 82, 95 S.Ct. 2080.

The existence and operation of a federally chartered savings and loan association is entirely a matter of federal law and it is clear that there is a "pervasive legislative scheme," *id.,* governing the relationship between associations and their borrowers. Congress has delegated to the Board broad discretionary powers to define by rules and regulations how the management of an association must act in relation to depositors and borrowers. *See Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). The statute, the Board's rules, and federal common law, then, clearly create federal rights in favor of borrowers and depositors.[26] Thus, in light of the growth of the Board's enforcement powers, the pervasive federal regulatory scheme, and the concomitant federal rights accruing to borrowers, the absence of an explicit show of congressional intent to grant a remedy that would

otherwise be consistent with the Act is not a bar to implying a private cause under *Cort*. Consistency with the purposes of the Act, however, depends on the role of the Board and the scope of relief.

*Legislative Purpose*

The Act places both the creation and enforcement of regulation in the Board's control. When the Board exercises its discretion in favor of fact-finding[27] and enforcement of its regulations in the district court, there does not appear to be any conflict with the Act since the core of the regulatory structure is the Board's power to create regulations and its discretion in having them enforced. When the Board favors a private action, there is no conflict with the Board's authority and moreover, where the alleged violations pertain to a regulation no longer in force, implication helps create an "effective system of sanctions." *Murphy v. Colonial Fed. Sav. & Loan Ass'n, supra,* 388 F.2d at 614. *Cf. Clark v. Gulf Oil Corp.,* 570 F.2d 1138, 1149 (3d Cir. 1977), *cert. denied,* 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978) (implication denied as interference with agency management).

There is, however, a potential for conflict with the regulatory scheme in the scope of relief. Although plaintiffs are seeking an award of damages, the statute appears to grant the Board only the power to issue cease and desist orders, in effect, injunctive or declaratory relief. Whether the Board's orders could compel restitution, for example, is not entirely clear. *See* 12 U.S.C.

12, 1978 at D–1 (Business Day). The House Committee on Banking, Finance, and Urban Affairs unanimously approved a bill, the "Financial Institutions Regulatory Bill of 1978," which may provide the Board with authority to levy fines for violations of its cease and desist orders. *Id.* The bill submitted to the House Committee by its subcommittee, "The Safe Banking Act of 1978," provided a civil penalty of not more than $1,000 per day for each day of violation of a final cease and desist order. *See* H.R.13088, 95th Cong., 2d Sess. (1978) (referred to Committee, June 12, 1978).

**26.** The statute and cases holding that federal law preempts state law in the relationship between an association and its borrowers and depositors dispose of the fourth *Cort* test,

whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States." 422 U.S. at 78, 95 S.Ct. at 2088. *See* note 16, *supra.* *Cf. Polansky v. Trans World Airlines, Inc.,* 523 F.2d 332, 337–338 (3d Cir. 1975) (implication denied when state remedy adequate and no countervailing federal interest).

**27.** It should be noted that defendant First Federal has been subject to supervisory examinations and audits by the Board, usually conducted once annually. The audit includes an examination of all loan charges, including attorney's fees. *See* Aff't Charles Harrington, filed Feb. 13, 1975, ¶ 17.

§ 1464(d)(2)(A). *Cf. City Fed. Sav. & Loan Ass'n v. Crowley, supra,* 393 F.Supp. at 657 (questioning Board's power to recover any damages). *See also* note 25, *supra.* An award of damages could put depositors and borrowers into conflict, though both are especial beneficiaries of the Act. Plaintiffs, borrowers, if successful on the merits, could demand recovery from the defendant First Federal and in effect satisfy the judgment from the depositors' funds. The Court doubts whether relief in an implied cause of action, particularly as an award of damages, can be greater than that which the Board has the authority to or customarily imposes. However, the question is not ripe for decision. The Court now decides that under *Cort* a private cause of action can be implied in favor of plaintiffs, as borrowers, for unamended § 563.35 when the Board, having considered plaintiffs' allegations, decides that any violations which may have occurred under a regulation no longer in force are appropriately left to fact-finding and determination in a judicial forum. Since the parties have not addressed the problem of the precise scope of relief and other procedural matters,[28] it is appropriate to refrain from making determinations on those questions until it becomes necessary to do so, and then with benefit of argument.

### Conclusion

In accordance with the foregoing, defendants are instructed to submit an order embodying the Court's decisions denying (1) plaintiffs' motions for class action certification and discovery on class action issues; (2) plaintiffs' motion for leave to add Demarest and Schmidt as additional parties defendant; (3) proposed intervenors Collins leave to intervene; (4) an award of prejudgment attorney's fees to counsel for plaintiffs; and granting (5) plaintiffs' motion for an order determining that plaintiffs may maintain a private cause of action pursuant to 12 C.F.R. § 563.35 prior to amendments effective September 30, 1976, and denying such order with respect to 12 C.F.R. §§ 545.6–10, 571.7(b).

### APPENDIX "A"

```
                              FIRST FEDERAL SAVINGS
                              and Loan Association

                              Main Office:  150 Elm Street
                              Westfield, New Jersey 07091

                                 November 1, 1972

Dear Mr. and Mrs. Mortensen
527 S. Chestnut St.,
Westfield, New Jersey
                              Re: Mortgage application covering:
                                  property at 645 Lenox Ave.,
                                  Westfield, New Jersey
Dear Mr. and Mrs. Mortensen:

Your application for a mortgage loan covering the property at the
captioned address has been approved in the amount of $43,200.00,
subject to the following terms and conditions:

1.  This commitment is based on the accuracy of facts presented
in the loan application.
```

---

**28.** It may become necessary, for example, to decide if plaintiffs are entitled to trial by jury on this part of their complaint.

2.   Said commitment will be for a term of 25 years at 7.50%.

3.   Your application indicated a closing date of December, 1972; therefore, this commitment shall expire February, 1973. If for any reason this does expire, the terms and conditions of same will be subject to review in the event an extension of time is desired.

4.   The monthly payment of interest and amortization will amount to $319.25, plus a monthly tax payment.  At the time of closing taxes will be escrowed by the attorneys in an amount sufficient to cover the next installment when due.

5.   We request that our mortgagors have an original fire insurance policy with them at the closing of title.  The amount of coverage must be sufficient to cover the amount of mortgage and must include extended coverage, and the name "First Federal Savings and Loan Association of Westfield, N.J." appear as first mortgagee on each policy submitted.

We are instructing our attorneys, Johnstone & O'Dwyer, 324 East Broad Street, Westfield, to proceed with the search of this property.

Please acknowledge receipt and acceptance of this commitment by signing and returning to this office the enclosed copy of letter, as soon as possible, together with one signed copy of Regulation "Z" form.

Very truly yours,

M. E. Barrett
Assistant Vice-President

MEB/dd

COMMITMENT ACCEPTED  /s/ Bent E. Mortensen

DATE    11/11/72

## APPENDIX "B"

JOHNSTONE & O'DWYER
Counsellors at law
324 East Broad Street
Westfield, N.J. 07090

Telephone
233-9000

November 2, 1972

Mr. and Mrs. B.E. Mortensen
527 N. Chestnut St.
Westfield, N.J.

Dear Mr. and Mrs. Mortensen:

Re:  645 Lenox Avenue, Westfield, N.J.

This firm represents First Federal Savings and Loan Association of Westfield. We are pleased to acknowledge the receipt of a commitment issued by the Association for a first mortgage loan covering the above premises and are about to commence our examination of title to the premises to make sure that title is marketable and in good order and that the lien of the Association's mortgage is a first lien on the premises at the time of closing.

The commitment calls for a closing of December 1972. We would appreciate it if you would establish a definite closing appointment through the broker to whom we are forwarding a copy of this letter. We shall, in turn, confirm the appointment well in advance of the closing date. If there is no broker involved in this transaction, please contact our office directly.

The enclosed information sheet should answer most of your questions with respect to the closing and closing costs. However, in the event you have any additional questions concerning this transaction or the closing costs, please call us and ask for Mrs. Covine.

We look forward to meeting you at the time of closing.

Very truly yours,

JOHNSTONE & O'DWYER

/s/ JOYCE COVINE
Joyce Covine, for
Michael V. Camerino

dk
cc:  Randolph Wiegman Agency

## APPENDIX "C"

Law Offices
REISDORF & JAFFE
A Professional Corporation

Edward Gary Reisdorf
Robert H. Jaffe

———

Robert A. Bernstein

8 Mountain Avenue
Springfield, New Jersey 07031

(201) 467-2246
(201) 467-2337

November 22, 1972

Michael V. Camerino, Esq.
Johnstone & O'Dwier, Esqs.
324 East Broad Street
Westfield, New Jersey 07090

> Re: Purchase of real estate by
> Bent Mortensen and Lise-Lotte Mortensen
> from Kenneth H. and Gloria G. Ling

Dear Mr. Camerino:

Pursuant to our telephone conversation of today, please be advised that Mr. and Mrs. Mortensen wish to have title insurance on the full amount of the purchase price on the property they are buying on Lenox Avenue.

In addition, would you please forward to us a copy of the mortgage commitment pursuant to our agreement. Thank you very much for your cooperation.

Very truly yours,

/s/ ROBERT A. BERNSTEIN

Robert A. Bernstein

RAB:mm
cc: Bent E. Mortensen
Certified Mail/RRR

APPENDIX "D"

DEPOSITION OF BENT E. MORTENSEN
April 9, 1974 (pp.19--20 to 24--4)

"Q.    Now, isn't it true that at the closing Mr. Bernstein, of the firm of Reisdorf & Jaffe, accompanied you to that closing?
A.    Yes, he was here.

.    .    .

Q.    Why did he come with you?
A.    He came with us because he had attended the closing of my sale just previous and that was really the reason why he came, because we were in his car.

Q.    But he was here at the closing with you as your lawyer?
A.    He was here, and as I said, I was not paying for the services. He merely told me that he wanted to attend as an experience, but as he was not my lawyer I was not paying for it.

Q.    But you selected him to come, did you not?
A.    I really didn't select him to come.  I selected him to attend the sale, but he came.  He came with me and my wife.

Q.    Did he stay with you and your wife throughout the entire closing?
A.    Yes, he did.

Q.    Did he examine the documents you signed?
A.    This I don't remember.

Q.    You don't remember that at all?
A.    No.

Q.    You don't recall that he looked at all the papers that you and Mrs. Mortensen signed that day?
A.    I don't recall it clearly.  I believe he did look at, at least some of the papers.

Q.    Didn't he advise you about those papers?
A.    What do you mean by advise?

Q.    Didn't he give you advice about those papers that he looked at?
A.    He looked through them.

Q.    And didn't he give you advice about those papers before you and Mrs. Mortensen signed them?
A.    Advise whether we should sign them or not, is that what you mean?

Q.    Yes.
A.    I don't believe he did, sir.

Q.    Did he tell you what was in the papers that you were signing that day?
A.    We had no questions.

Q.    You had no questions?
A.    No.

Q.    And Mr. Bernstein did not tell you what the documents were that you were signing that day?
A.    No.

Q.    He did not?
A.    No.

Q.    He didn't say anything to you at all about the papers?
A.    As far as I remember, he said and he looked through some papers and there was no question and there was nothing there, I believe, we didn't understand.

Q.    Now, when did you first meet Mr. Bernstein?
A.    I met him, I believe, three to four weeks prior to the sale of our house and prior at 527 North Chestnut.

Q.    How did you happen to meet Mr. Bernstein?
A.    We engaged the law firm of Reisdorf & Jaffe to represent us at that sale.

Q.    The sale of your Chestnut Street house?
A.    Right.

Q.    Now, how did you get in touch the first time with the firm of Reisdorf & Jaffe?
A.    My wife is a friend of Mr. Jaffe's wife.

.        .        .

Q.    As a result of your wife knowing Mrs. Jaffe, you then retained the firm of Reisdorf & Jaffe to aid you in the sale of your home on Chestnut Street, is that correct?
A.    Yes, sir.

Q.    Did you also tell them or any of them that you were about to purchase another property in Westfield at 645 Lenox Avenue?
A.    Yes, I did.

Q.    And did they give you any advice concerning that transaction?
A.    No.

Q.    Did you instruct them to undertake any work for you in connection with the purchase of the property at 645 Lenox Avenue, Westfield, New Jersey?
A.    No, I didn't.

Q.    Did you discuss with any of the lawyers in that firm or who were employed by that firm the question of title insurance on the property at 645 Lenox Avenue, Westfield?
A.    Yes, I did after--I don't recall when I discussed that with Mr. Jaffe.

Q.    But you did talk with Mr. Jaffe or one of the lawyers in that firm about getting title insurance on the new house you were buying?
A.    Yes.  I asked Mr. Jaffe his opinion.

Q.   And what was his opinion?
A.   He recommended that I get title insurance.

Q.   So we are now in agreement that in connection with the purchase of 645 Lenox Avenue you did ask the Reisdorf & Jaffe firm for some legal advice about it?
A.   I asked his opinion regarding our title insurance, yes, which he recommended."